I need this replication. That was the truth. You're good. Counselor Lumish, did I pronounce that correctly? Lumish. Okay. And you're reserving three minutes of your time for rebuttal. We're ready when you are. Mr. Lumish, help me out here. If I click, using this invention, if I click on http://www.walmart.com, do I end up at that same walmart.com, same exact address, but the page is in Spanish, or does the web address change to something else? There are different ways that it's been implemented, Your Honor. The content should be exactly the same. So you should get what you would have gotten at walmart.com in Spanish. Whether you do that by going to a page that is now walmart slash, for example, Spanish.com, or you'd go through a proxy server, a translation manager that then provides it back to walmart.com to translate and send back to you, is not required in the claims. So it could go either way. Your Honor, the invalidity decision of the board is based entirely on a claim construction of the boards of said hyperlink that makes no sense in the overall context of the patent. What if we conclude that when we read prosecution history of the reexamination, we find that TransPerfect, in fact, advanced that very claim construction that you just told us makes no sense in the context of the patent? So I guess, to me, I'm wondering, hypothetically, is a patent owner allowed to say a claim means one thing to one part of the agency in one proceeding, and then to another part of the agency in a different proceeding, the patent owner can say the exact opposite of the meaning of that same claim term? Do you think they're allowed to do that? So allow it as far as a regulation, Your Honor? Probably, but I wouldn't say that that should be permitted. Should there be a stop? If a patent owner says the claim means X in a reexamination, and then in another proceeding, a year later, in front of the agency, the patent owner, on that same claim term, says that claim term means not X, do you think they should be allowed to do that? Only if, when they said it was X, the patent office said, you're wrong, and it means X prime. I think there would be nothing wrong with coming in later and saying, it means X prime. It's now been adjudicated. But what if the examiner says, in that first proceeding, you say it means X, I agree. I think if there's a meeting of the minds, and the patent owner really said X, and the examiner understood and actually came back with the same X, then you should hold the patent owner to that construction. That is not what happened here. Let me be very, very clear. That is not what happened in this case. But I think that would be a fair outcome. Whether there's law or regulation to compel that, I'm not certain. But I think that would be a fair way to proceed. If I may, I'd like to walk you through why that's not at all what happened here. If you go to the file history, and that's really all that's at issue from the patent office. I think there's no dispute that there's claim language, that there's specification. They argue these two are somehow completely at odds with each other. File history is what they focused on, and there's page after page after page about the file history. But there is no argument, and I think there is a concession, that there is no disavowal, disclaimer, or estoppel here. So Your Honor's question is actually not about estoppel. It's not an argument that's being advanced by the patent office today. It's wrong on the merits. If you go and you look at what TransPerfect said and its expert, Dr. Nakamofsky, it never said that the patent should be limited to having links that point back to the untranslated content in the translated webpage. And that's really what this issue, in my mind, distills down to. Well, Lakritz, the reference, obviously once you click on the hyperlink in the translated webpage, you are going to a different URL than you would have when you clicked on that same hyperlink in the untranslated webpage. That we can all agree, and that we can also agree that TransPerfect pointed out in distinguishing Lakritz over the claim. I think that's quite right. Lakritz was a server for a corporate structure. Unlike a web system in the way that the 022 Scanlan patent is focused on, where I think it was free-ranging, anything you click on, you can get translated through the 022 patent. Can you tell me what I said was wrong? Because I'm just recalling the two key paragraphs in the prosecution history that I remember reading. Sure. If I heard you correctly, Your Honor, what I think you got wrong was the suggestion that in Lakritz, you would always get the same content that was in the untranslated webpage in the translated webpage, or in the untranslated document in the translated document. Well, my point was that the hyperlink in the translated document would send you to a different URL address than clicking on the hyperlink in the untranslated webpage. It may not even go to a URL. It's a corporate server. It could go to… It could go to a different target. Yes. Right? You're going to a different place. You're getting a different document. And by target, what it talks about is content. So you're saying the prosecution history didn't identify the two different URL addresses? It does talk about tags and references, and those could be URLs. I'm just saying it doesn't have to be. Look at page 22 of your blueprint. You have some figures illustrating English and Spanish pages. Okay, you've got it. I do. So if you click on Store Tienda in Spanish, does it always take you to exactly the same site simply translated into Spanish? Exactly, yes. So what you should get is the same list of stores with the same text about the list of stores in Spanish that you would have had in English. That's where Lakritz is different. What Lakritz teaches is you may have country-specific or language-specific content. So if you click on a similar page with the Lakritz patent, and you click Tiendas or you click Stores, you might be sent… Here, if I click it in English, it might send me to the local Best Buy at the district. Right. But if I'm in the Spanish site, for whatever reason, it might send me to Reston or Alexandria or something like that. Because the patent talks about… I want to make sure I get this right. If you look at A2245, the Lakritz patent itself, at column 5, lines 27 through 33, talks about allowing a site to be built with, quote, content that is specific to a particular language and country, and later talks about regional-specific information that may only be required in a single language. So Your Honor hits on exactly the distinction that was – and maybe it could have been made more artfully in file history, but the distinction that was being made. In the O22 patent, you get exactly the same content, albeit translated. In Lakritz and in Dunsmuir, you might get different content, a different target altogether. So what about these two paragraphs at A1449? I mean, I know you're talking conceptually what you argue, but why don't you just walk us through those two paragraphs in A1449, where it looks to me, TransPerfect is saying, regardless of the usage of a relative or absolute hyperlink, claim one requires that you're going to – that the target of the hyperlink is the same after you translate the webpage. Yes, Your Honor. And then that is unlike Lakritz because Lakritz shows that the hyperlink changes, right? Why – you can see it here, right? I mean, one is – I mean, don't make me read the whole thing, but you can see that the www addresses are different for the two hyperlinks. So it's not the same hyperlink. And that seems to be clearly the point of what this paragraph at A1449 is trying to make about Lakritz versus claim one, which according to TransPerfect is the same hyperlink, same target. So I disagree, Your Honor. I think the text you're pointing at, if you read it in isolation and you only had that text, we'd have a bigger problem than I think we should have. You have to read it in context of the overall discussion of Lakritz and in the file history. So can you point me to the pieces of the prosecution history surrounding these two paragraphs that to you help me walk away from my very specific understanding of these two paragraphs? Thank you, Your Honor. Yes, I appreciate the opportunity to do that. So if you start actually on page 1448, if you look at the top of the page there, you see in the second paragraph it referring to Lakritz as a typical corporate system. It operates by placing parallel document trees in corresponding language-specific directories on a web server. So now you have pre-selected, pre-translated content going into servers. Carry that forward to 1449 where Your Honor was looking, but look a paragraph above. And if you start at the very top of the page on 1449, it talks about why the Lakritz approach is, quote, fundamentally at odds with the ability in the 022 patent to provide a translation of said further electronic communication simply by following an arbitrary hyperlink. That's an important phrase. In Lakritz, you follow the hyperlink to the content. So you have a BestBuy.com. It's got a link to the stores page. And now it's translated in Tiendes. You follow that link. Here you have pre-built, pre-translated content in the servers themselves. It says right after where I just read that one of skill in the art, reading Lakritz, would conclude that the user can obtain translations of further electronic communications only for pages that have been pre-translated with translations stored in specific directories on the server. So the structure's different. Now you get into the language Your Honor's referred to, which, again, if you just read it in isolation, I'm not suggesting that the patent office is making it up, that there's not some reason to make the argument. But that language in context goes down to the bottom. Look at the paragraph after that. It says as a result. Now it's after these two paragraphs, which I think are fairly complicated and difficult to follow, it sums it up. It says as a result of using relative URLs instead of absolute URLs in Lakritz and a system of parallel directories, one for each target language, so that's Lakritz, hyperlinks in different translations from the same source document will link to different documents. Different translations of, and this is the key word, another source document. What they're telling you there is that this content is different. It's going instead of to a translated version of the same source document, it's going to a different another source document. It's pointing to a different address. That's not what that means, Your Honor. Can you comment on the last sentence of that paragraph? The one I was just reading? Yes, it's on 1450, the last sentence of that. Lakritz cannot provide translation of said further electronic communication when said hyperlink is activated as recited in Claim 1? Yes. Yes, Your Honor. So I think this is exactly the point I'm making, which is in Claim 1, what you get is the same content translated. It says so. If you look through the claim, I think it's the seventh limitation. You click on the hyperlink for the further communications, and they come back translated. And so what this is telling you, when you put it in the context of the sentence I read, is you're not getting that content translated. You're getting, you could be getting different content translated. So you're not going to click the hyperlink and get the same content all being translated. That's what that sentence means. I just want to point out, Your Honors, on 1429, 1443, TransPerfect makes very clear in this same document that the patent- 1429, that's kind of the background section of that office action response, right? Well, that's what the Patent Office calls it. I don't think that's fair. It's the very beginning of the brief. It's the introduction to the arguments. It's an introduction to what TransPerfect's view is of the 022 patent. And it says in one implementation, when translation- I'm describing an embodiment in the specification, not really discussing the actual claim language itself. I don't see A1429 wrestling with hyperlink said hyperlink. I see it more describing the one embodiment that's discussed in the specification. And so I think part of the debate here is to what extent does the claim language match what's going on in the specification? And so what I'm most interested in is those locations in the prosecution history where the patent owner is wrestling with the claim language, like those two paragraphs in A1449. Maybe I can try another page then, Your Honors. 1443. In this page, the TransPerfect is wrestling, as you put it, with the Murata reference. And they distinguish Murata as not practicing Claim 1. You can see at the very bottom of the page it says, Murata cannot anticipate Claim 1. So we're absolutely talking about what is and is not inside of that claim. And it says at the last four lines of the paragraph above that, one of skill in the art reading Murata would conclude that in this embodiment, translation of a further electronic communication is not provided or delivered to the user when a link on a document translated from the source document is activated. So now we have a translated link on the source document that's not coming back from Murata. This is describing how Claim 1 works. It's distinguishing it, and it's making it clear that in Claim 1, you have a link on a document that is translated from the source document when it's activated, as opposed to Murata, where that doesn't happen. Okay. You're out of your time, and you kind of used up your rebuttal time, too. But we'll restore some time. Thank you, Your Honor. Thank you. So restore, Mr. Lewis, two minutes of rebuttal time. Mr. Warwick. Good morning, Your Honors. May I please report? First of all, I'd like to clarify we're not focusing just on the prosecution history. We do have a fundamental disconnect between the spec and the claims. But I'd like to first address the arguments that were made about the file history. Conceptually, do you think that estoppel would apply in this kind of situation? You didn't say that in your green brief, nor did the court actually say that. But I guess I'm asking you, what does the agency think about a situation like this, where in one proceeding, hypothetically, a patent owner is saying something about a claim term that is precisely the opposite of what the patent owner is saying about that same claim term in this proceeding? Well, it's certainly not a practice we condone. I'm not aware of a particular decision where we have held someone to that. I can't say. The reason the Board did not address estoppel was that the final Interparties Reexamination decision did not issue until March of last year. And so we point that out in our brief as context. The Board pointed out that there were these contrary arguments that were being made in a parallel proceeding. And what we pointed out in our brief is that the examiner did, in fact, rely on those specific arguments and came to the conclusion that the claims were patentable over the prior art asserted in that proceeding. And the key to all of this with the Interparties Reexam, I think, is that there is a direct conflict between not only what was told to the Board and what was told to the examiner in that proceeding, but also what TransPerfect has said in these proceedings. In page 14 of the reply brief, quote, TransPerfect never argued that the 022 patent claims links had to have the same targets in the untranslated and translated pages. But if we look at page A1449, which we were looking at just a few minutes ago, they use that specific language about same targets when discussing Claim 1. And that language was referenced by the Board on page A17. It was quoted by the Board. And when the examiner made a final determination in the Interparties Reexam on page A2054, he again specifically quoted that language from TransPerfect. And on A2055, concluded that because TransPerfect had consistently made that argument, that claim construction argument, he would adopt that claim construction, even though he noted on 2054 that that was exactly the opposite position, that TransPerfect was advancing in this proceeding. Not only that, but there was another CBM proceeding in which trial was not instituted, and the reason it was not instituted, according to the Board, was because of this same construction, which was adopted by the Board in this case and also in the Interparties Reexam. And it would be fundamentally unfair, we submit, to allow the patent owner to advance these directly contrary positions in parallel proceedings, and at the end of the day, to have a patent that remains issued with patentable claims, particularly because when we're talking about claims that could encompass a method of using the same hyperlinks to provide translations of further linked material, there's no description in the specification of how to do that. That's part of the other side's argument here, does said hyperlink necessarily mean precisely exactly the same hyperlink that was already decided in the claim, because the claim language already indicates that there's going to be a translation of the electronic communication. And we know the electronic communication, among other things, includes the hyperlinks. So that suggests there's some kind of translation of the hyperlink that's being called for in the claim. So just based on the way the claim is set up, it suggests that maybe said hyperlink can't really be the identical hyperlink that's decided early in the claim, because at a minimum, the label that's on the web page has been translated from, say, the word stores to the word diendas. So what's your response to that? So a couple of things, Your Honor. One, we can see that the label would change, and it would make sense to translate the label that's written in prose. The word store could be translated to the word diendas. But would the underlying link stay the same, taking you to walmart.com, and you're looking at exactly the same page, simply translated? Well, if the URL part of the hyperlink remains identical, then you're going to be directed to the same original page, which in that case would be an untranslated page, not a translated page. And the label, there's this argument in the briefs about if you're changing the label, are you changing the hyperlink? So that was sort of what I was asking your brother-in-arms, and that is, if I click on that Walmart link, does it pop up as a Walmart link but in Spanish? And you're saying no. Well, certainly not in the... I'm not saying diendas. I'm saying click on diendas, and underlying it is a URL, walmart.com. And you're saying that pops up in English. And he's telling me it pops up in Spanish. Well, so the goal of having the translation software would certainly be in that scenario to get a translated version. And in the 022 patent, the only method of doing that that is described is by replacing the URL portion of the hyperlink to point to the translation manager. Somehow you have to get to the translation manager because that's the only disclosed functionality for translating. That's my understanding. I guess you're saying that when you look at the claim language based on a proper construction of said hyperlinks, what necessarily the claim is calling for is for when you activate said hyperlink, the address that you are pointing towards is the same address that you're pointing at when you're initially talking about one or more hyperlinks earlier in the claim. That's exactly correct. And there could be methods of... And if that sounds weird, crazy, and strange, then so be it because we're stuck here with the undisputed claim construction of hyperlink and said hyperlink, according to patent law principles, has to mean and refer to the earlier hyperlink, whatever that is. Right, and TransPerfect concedes that said hyperlink does refer back to the original hyperlink. But in this case, there could be other methods of translating that content without changing the URL. And Dr. Clark, a TransPerfect expert, speculates about a lot of things that perhaps a plug-in application could do, but for all the reasons outlined by the board and in our brief, they simply don't describe those. But disturbingly, their claim construction would encompass those solutions, which is exactly the reason we have the written description requirement is to police against that. And with regard to the labels versus the URL, we would submit that you could, for example, change the sign over the Holland Tunnel to rename it or to translate that sign into a different language, but you still go to the same place. A URL is a place on the Internet. It's a destination. And unless you're changing that, there's no way that they disclose in the 022 patent that you would get to the translation manager and thus get to a translated version of the webpage. Do you know if TransPerfect argued below this piece of the claim that talks about translating the electronic communication necessarily requires translating the text of the hyperlink? And so that would be a reason why we can't look at the words said hyperlink later on in the claim to be identical to the one or more hyperlinks recited earlier. I don't believe they phrased an argument in that particular fashion, Your Honor. I don't know if they were making an argument about, well, you have to look at the hyperlink from the user's perspective. And if you look at it that way, then it is basically the same hyperlink. They certainly made an argument, at least to this court, that there has to be a translation of the hyperlink.  But as we point out in our brief, it's really nonsensical to talk about translating a URL because, again, a URL is a specific destination. You can't translate www.cnn.com into some other language and somehow get the Spanish version of that news site. It just doesn't work that way because a URL denotes a particular location on the Internet. And so the 022 patent, first of all, isn't even directed to translating further links. There are only three sentences that are addressed to this at all. And I think that's important because if translating the entire document necessarily required some sort of translation of the URL portion of the hyperlink, there would be no need to say, also, by the way, you may replace the URL with the new hyperlink that points to a different destination. You would have already addressed that in the context of translating the electronic communication itself. And with regard to the argument counsel was making about lacquerettes and the file history, I would like to address that in terms of lacquerettes having these pre-established directories of pre-translated content. That goes to different elements of the claim. In Claim 1, the other elements talk about once you click on said hyperlink, you deliver a translation of a document that was translated when the original document was translated or obtaining a new translation of that. It goes to a different term. And again, at the end of the day, the arguments that were made about said hyperlink at A449, cited by the board and then repeated by the examiner in allowing the claims in the inter-parties re-exam, are unequivocal. You have to have the same target. That's exactly the claim construction the board adopted, and for that reason they found no written subscription support, and we believe that's supported by substantial evidence. Okay, thank you, Kevin. Thank you. Your Honor, the plug-ins argument that you heard from counsel, it's not true to say that the plug-ins in the patent do not disclose translation, and I think that's what was briefed, and I think we heard a little bit about that today. If you look at the Scanlon 022 patent at A42 and 43. I think you argue that the plug-in maybe possesses a function towards translation, but where does the specification support that? So at column 4, line 61, through column 5, line 3, and at column 6, lines 20 through 30. So if you start with the first one, it's a longer passage, but it starts at the bottom of column 4, and it's describing what it calls Explorer Bar 11, implemented as an internet browser plug-in, and it gives the functionality of that plug-in, Your Honor, at the top of column 5. It refers to part of that functionality is supporting the translation of web pages or text selections by a mouse click. So for our purposes with respect to the claim, I think what is being disclosed is translating the electronic communication from, say, English to Spanish. Now the next question is really where in this patent does it describe using the plug-in to once the hyperlink on the translated page is activated, it interrupts the pointing to a particular address and then reroutes the user to a different address in order to arrive at a translated further electronic communication. So column 6, Your Honor, lines 20 through 30, refers to the plug-in applications, and at the bottom of that passage, it says that it can let me let you get to it. So column 6, I'm going to read from line 27. One of the things the plug-in does here is, quote, communicate with the translation manager. That's the interruption you're talking about. Now instead of going to the walmart.com, as Judge Wall put it, you go to the translation manager, the proxy server that's going to serve the translated version of walmart.com. So you communicate with the translation manager via the Internet to request translation in response to a keystroke, mouse action, voice command, or other method. Now admittedly, that doesn't limit it to the further communications, so the additional links, but nor does it limit it to only the first click. And so what you have here is a description of getting to a translation done by the translation manager, which is not done by a clicking of a hyperlink, but instead by a plug-in. So I think that support is sufficient at a minimum. The other argument I would ask to address is this. So this, what you just read, that would require an additional action, right, like an additional click. So translation is not automatic there. No, I think this is still the same concept. The plug-ins are shown in the figures, Your Honor, in the graphics as drop-down menus or buttons on the browser, things like that. And the patent's very clear that you can pick languages, for example, so maybe you click on the drop-down menu, it comes down, and it shows you French, Spanish, German, Italian, Japanese, and then you pick the language you want. That's still called one-click in this patent. It still talks about that as the thing that activates the translation, being the click on the language that you choose. But there is other interaction that's permitted. The concept is to reduce interaction, overwhelmingly, but not necessarily to get it down really to a single click that does everything. And that's where I think there's a real breakdown in the argument, right, is you have an admission from the patent office that the claims, that the specification is about reducing clicks and that the specification is about replacing links, but then the claims somehow are supposed to be about preserving the links. It just doesn't make sense in that big picture of the patent. If you're going to reduce the number of clicks, the cleanest, simplest way describing the patent is to replace those links. I guess I just don't necessarily equate a keystroke with a link, a hyperlink. Oh, mouse action. Any questions? No. It says mouse action, Your Honor. That's what I meant by click. All right. All right. Thank you very much. Thank you, Your Honor.